## Case No. 8,726.

### McCORMICK v. SEYMOUR et al.

[2 Blatchf. 240.] [1]

Circuit Court, N. D. New York. June, 1851; Oct. Term, 1851. [2]

PATENTS—SIMPLICITY — NEW OPERATION AND EFFECT—REAPING MACHINE—TIME WITHIN WHICH TO APPLY.

1. In an action for the infringement of a patent, it being objected, that the arrangement of machinery claimed in the patent was so simple and obvious as not to be the subject of a patent: *Held*, that novelty and utility in an improvement are the only conditions requisite to the granting of a patent.

[Cited in Whitney v. Mowry, Case No. 17,-592; Tuck v. Bramhill, Id. 14,213; Celluloid Manuf'g Co. v. Comstock & Cheney Co., 27 Fed. 360. Criticised in Simmonds v. Morrison, 44 Fed. 760.]

2. On a question of the novelty of an improvement in a reaping machine, the inquiry for the jury is. whether the alleged prior invention is identical with the plaintiff's, or whether his involves a new operation and produces a new effect on the standing or tangled grain, in the use of the machine.

[Approved in McCormick v. Manny, Case No. 8,724.]

3. On the point of infringement, the inquiry is. whether the defendant's machine involves, in its construction, some new idea not to be found in the plaintiff's, or whether the plan of the former is in substance the same as that of the latter, the differences introduced in the former being merely differences in things not material or important.

[Cited in Simmonds v. Morrison, 44 Fed. 760.]

4. If the defendant has taken the same general plan and applied it for the same purpose, though he may have varied the mode of construction, he will only have introduced mechanical equivalents, and it will still be, substantially, and in the eye of the patent law, the same thing.

[Cited in Simmonds v. Morrison, 44 Fed. 760.]

5. In McCormick's patent of October 23d, 1847, for improvements in reaping machines, the claim of "the arrangement of the seat of the raker over the end of the finger-piece, which projects beyond the range of fingers, and just back of the driving-wheel, as described, in combination with and placed at the end of the reel," is not a claim for the seat, as a seat, or for its particular mode and form of construction, but is a claim to the arrangement and combination of machinery described, by which the benefit of a seat or position for the raker on the machine is obtained.

[Approved in McCormick v. Manny, Case No. 8,724.]

6. Since the act of March 3, 1839 (5 Stat. 353), a patentee may make and vend or use his invention within two entire years before the time when he applies for a patent, without forfeiting or necessarily abandoning his right to a patent; but, if he either sells a machine, or uses one, or puts one into public use, at any time more than

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[2] [Reversed in part in 16 How. (57 U. S.) 480.]

two years before his application, it works a forfeiture of his right.

[Cited in Toppan v. National Bank-Note Co., Case No. 14,100.]

7. The act virtually extends the patentee's privilege to sixteen years instead of fourteen.

8. The mere fact that an inventor makes and sells an invention, or puts it into public use, at any time within two years before he applies for a patent, is not, of itself, an abandonment, of the invention to the public.

[Cited in Bevin v. East Hampton Bell Co., Case No. 1,379; Andrews v. Hovey, 124 U. S. 705, 8 Sup. Ct. 678.]

9. Something more must be done within the two years—there must be some acts of the inventor, indicating an intention on his part to devote his improvement to the public in general—in order to authorize a jury to come to the conclusion that he has so abandoned it.

10. Those who rely upon the ground that a party has forfeited a legal right secured to him in due form of law, for the purpose of defeating his enjoyment of that right, must make out the point clearly and satisfactorily, beyond any reasonable doubt or hesitation; because, the law does not favor an abandonment, and throws upon the party who seeks to obtain the benefit of a forfeiture the burden of proving it beyond all reasonable question.

[Cited in Jones v. Sewall, Case No. 7,495.]

11. The general rule as to damages in patent suits is, that the plaintiff is entitled to the actual damages he has sustained by reason of the infringement; and those damages may be determined by ascertaining the profits which, in judgment of law, he would have made, provided the defendant had not interfered with his rights—upon the principle that, if the defendant had not so interfered, all persons who bought his machine would necessarily have purchased the patentee's.

12. There is no distinction, in regard to the rule of damages, between an infringement of an entire machine and an infringement of a mere improvement on a machine, and the damages. in the latter case, are not to be limited in proportion to the value of the improvement.

13. The inventor of an improvement on an old machine, who has a right to use the old machine, is entitled, under a patent for his improvement, to the benefit of the operation of the machine under all circumstances, with the improvement engrafted upon it, to the same degree in which the original patentee was entitled to the old machine.

14. In order to ascertain the nett profits on the making and selling of machines, the jury must take into account, as making up the cost and to be deducted from the sale price, the cost of materials and labor, the interest on capital used, the expense of putting the machines into market, such as agencies and transportation and insurance; and, where the article is sold on credit, a deduction must be made for bad debts.

15. When the actual damages are ascertained, the plaintiff is entitled to interest on them from the commencement of his suit.

16. The jury may also allow to the plaintiff the damages which he has sustained beyond those arising from the actual interference of the defendant in making and putting into market machines which infringe the patent—such as damages from publications by the defendant, disparaging the plaintiff's improvement, while engaged in violating the patent.

This was an action on the case [by Cyrus H. McCormick against William H. Seymour and Dayton S. Morgan] for the infringement of two several letters patent granted to the

plaintiff, one on the 31st of January, 1845 [No. 3,895], and the other on the 23d of October, 1847 [No. 5,335, reissued May 24, 1853, No. 239], for improvements in reaping machines.

Samuel Stevens, Charles M. Keller, Edwin W. Stoughton, and Samuel Blatchford. for plaintiff.

Ransom H. Gillet and Henry R. Selden, for defendants.

NELSON, Circuit Justice (charging jury). The first patent in this case, which is in question between the parties, was granted to the plaintiff on the 31st of January, 1845, in general terms, for "a new and useful improvement in the reaping machine." The only improvements claimed in this patent, which it is insisted have been infringed by the defendants, are two.

The first is the arrangement and combination of the bow and dividing iron, for separating the wheat and straw, in the process of reaping or cutting, in the manner described. In speaking of this improvement, the patentee says, that he has a piece of scantling some three feet long and three inches square, made fast to a projection of the platform by screw-bolts; to the point of this piece of scantling is made fast, by a screw-bolt, a bow of tough wood, the other end of which is made fast at the back part of the platform, and is so bent as to be about two and a half feet high at the left reel post, and about nine inches out from it, with a regular curve. Then there is a description of the dividing iron, which is an iron rod of a peculiar shape, made fast to the point of the scantling before described. by the same screw-bolt that holds the end of the bow. From this bolt the iron rises towards the reel at an angle of thirty degrees, until it reaches it, that is, until it extends to the reel; then it is bent, so as to pass under the reel, as far back as the blade or cutter, and to fit the curve of the reel. Then there is a contrivance described to adjust this iron to the reel as it is elevated or depressed, which is not material in this case. "By means of the bow," says the specification, "to bear off the standing wheat, and the iron to throw the wheat to be cut within the power of the reel," so that the wheat may be caught and brought to the cutter and upon the platform. "the required separation is made complete.' The invention, as claimed in the patent, is substantially this—the arrangement and combination of the bow and the dividing-iron, for separating the wheat, in the manner described.

On the part of the defendants it is insisted, first, that this arrangement and combination is so simple and obvious, that the claim, even admitting it to have been new and not before in use, is not the subject of a patent; secondly, that if it may. be the subject of a patent, yet there was nothing new in it. but, on the contrary, it had before been known

and in public use; and thirdly, that admitting both its patentability and novelty, still the contrivance used by the defendants for separating the wheat, in the process of cutting and reaping, is substantially different from the contrivance of the plaintiff.

As to the first point—whether the claim in question constitutes the subject-matter of a patent—the sixth section of the patent act of July 4, 1836 (5 Stat. 119), provides, in substance, that any person, having discovered or invented any new or useful art, machine, manufacture or composition of matter, or any new and useful improvement on any art, machine, manufacture or composition of matter, not known or used by others before his discovery or invention, and not, at the time of his application for a patent, in public use or on sale with his consent, may make application to the commissioner and is entitled to a patent. .This is the authority conferred on the patent-office for the granting of patents to inventors, and the act defines with great particularity and clearness what constitutes a patentable subject, at the same time declaring what persons are entitled to a patent. Such being the definition of a patentable subject, declared by the act of congress itself, you see from it that the improvement upon a machine, which is the kind of invention in question here, must be new, not known or in use before, and must be useful, that is, the person claiming the patent must have found out, created and constructed an improvement which had not before been found out, created or constructed by any other person, and it must be beneficial to the public, or. to those persons who may see fit to use it. Novelty and utility in the improvement seem to be all that the statute requires as a condition to the granting of a patent. If these are made out to the satisfaction of a jury, then the subject is patentable, and the inventor is entitled to the protection and benefit of the statute. Otherwise, he is not. This is, perhaps, the only general definition that can be given of the subject of a patent, and it is the only one that the law has given for our guide. The two questions, then, on this branch of the case, are—was this contrivance, as constructed by the patentee, new and not before known?—and, if so, is it useful? Both these questions being answered in the affirmative, the case comes directly within the definition of the statute.

As to the first question—whether this contrivance for dividing the grain in the process of cutting it was new, or whether it had been before known and in public use. This is very much a question of fact, depending upon the evidence produced in the course of the trial, in connection with the illustrations afforded by the models and drawings and the original machines.

It is claimed by the defendants, that this divider of the plaintiff is to be found in Hussey's machine, patented as early as 1833.

A small model of that has been produced; and, although Hussey, in his deposition, gives the entire form and structure of his divider, yet it requires some particular examination to ascertain its precise character. It will be found, however, to be simple and very readily comprehended, and the jury are in full possession of all the facts that are material and important for the purpose of determining whether or not the divider of Hussey affords reasonable evidence that there is nothing new in the contrivance of the plaintiff. Hussey, in his deposition, gives a brief description of his separator. He says that he projects the outer point, to separate the standing wheat, to any given length, and that he also uses an upright board, on a line with the outside of the frame of the machine, to prevent the wheat from rolling or falling off from the cutters.

Then, there is the machine of Mr. Moore, of which you have a model, and which you will consider in connection with his evidence. He states that he constructs his separator with two horizontal lines, being a part of the frame of the machine, converging to a point, and projecting some two feet beyond the fingers; and that, on the machine he built in 1836, he raised a third on the centre line, corresponding, in that respect, with the board used by Hussey in 1833.

You will examine these separators of Hussey and Moore, in connection with the evidence, and look at the particular operation of each in the process of cutting, and as certain, to your own satisfaction, whether those contrivances are identical with the plaintiff's, or whether he has made one different from either, involving a new operation, and producing a new effect on the standing or tangled grain, in the use of the machine.

The next objection taken by the defendants is that, assuming the divider of the plaintiff to be new and useful and patentable, and that he is entitled to the enjoyment of it free from any interference, still he is not entitled to recover, because the defendants have not used his separator, but have used a different contrivance. This presents another question for you to determine, on an examination of the two separators.

In order to take the separator of the defendants out of the charge of infringement, it is necessary that they should satisfy you that it is substantially and materially different from the plaintiff's; in other words, that it involves some new idea in its construction not to be found in the plaintiff's. If it is found there, of course it is an appropriation of his invention. If not, then it is an independent improvement and no violation of the plaintiff's right.

It is proper to observe, in respect to this particular question, that whether the separator of the defendants be or be not an interference with that of the patentee, will depend upon this—whether the plan which the defendants have employed, in constructing their separator and in dividing the grain, is or is not in substance the same as the plaintiff's, and whether or not the differences that have been introduced by the defendants in their form of construction, and in accomplishing the design which all these separators seek to accomplish, are merely differences in things not material or important; in other words, whether their plan is, in substance and effect, a colorable evasion of the plaintiff's contrivance, or whether it is new and substantially a different thing. If the defendants have taken the same general plan and applied it for the same purpose, although they may have varied the mode of construction, it will still be, substantially and in the eye of the patent law, the same thing. Otherwise, it will not.

Subject to these observations, tending to advise you, as far as is practicable, on so nice and somewhat metaphysical a subject, as to the rules of law and general principles that should govern on a question of this kind, I shall leave it to you to determine, on the evidence and on an inspection of the models, whether the separator of the defendants is substantially different, in its operation and effect, from that of the plaintiff, or whether it is, in construction and operation, to all substantial and real purposes, the same. If it is, then, if you are with the plaintiff on the two previous questions, you will find for him on this branch of the case. Otherwise, you will not.

The second claim, which also arises under the patent of 1845, is for setting the lower end of the reel-post behind the blade or cutter, curving it and leaning it forward at the top, for the purpose of relieving the cutting, which was before embarrassed by the upright post in front of the cutter, by which means, also, the top of the post can be braced to the tongue.

The description in the patent is substantially this—that the reel-post on the left side of the machine, instead of being placed before the blade, standing perpendicularly and braced as before, is set, say nine inches, behind the blade, and so leaned forward as to bring the middle of it, or point at which the end of the reel is supported, to its former perpendicular position, the top of the post being thereby so put forward as to admit of its being braced directly to the tongue; by which arrangement the patentee is enabled to brace the post firmly, and, the lower end of the post being behind the blade and crooked out, and the end of the dividing-iron being also bent inward, all tendency of straws to hang upon the post and interfere with the cutting is removed.

The object of this change was to get rid of the post in front of the cutter, which prevented the separation of the straw, and also prevented the grain that was cut from falling on the platform, the tendency being to become entangled around the post. This was

the purpose, as declared by the patentee, of the arrangement by which the post is carried behind the cutter, and yet the place of sustaining the end of the reel is preserved.

It is insisted by the defendants that this arrangement is not the subject of a patent, but is a very common device, involving no skill or ingenuity beyond that of the clever mechanic; that it would have suggested itself to any one using the machine; and that it embodies no inventive mind. It is also insisted, by the defendants, that their arrangement for supporting the end of the reel is not substantially the same with the plaintiff's, but is a new arrangement, not suggested by the plaintiff's improvement of setting the post back of the cutter and bending it outward and leaning it forward, and that it does not embrace the principle or idea found in the contrivance of the patentee.

I have already called your attention to the definition of a patentable improvement, as given by the act of congress itself. It must possess novelty and utility. It will be for you, bearing in mind that definition, to examine whether or not the plaintiff's arrangement in regard to the reel-post is a patentable improvement.

You will also examine the models of the respective machines, and recur to the testimony of the experts, and determine whether the change made by the defendants in the mode of supporting the end of the reel, and of getting rid of the upright post in front of the cutter, is a new contrivance, not only in form but in substance, and is not a change suggested naturally from the contrivance of the plaintiff. If it is new, then it is no infringement. But. if it embodies the same idea and its arrangement carries out the same idea—for, this is the true view of the question involved—then undoubtedly it is an infringement.

The general principle which I before stated in respect to the dividing apparatus is equally applicable to the second claim. If the defendants have taken the same plan and applied it to the same purpose, it is in substance the same thing, although they may have varied the mode of construction. It is then only what is called a mechanical equivalent, another way of doing the same thing, by means of mechanical skill. which. however meritorious and creditable to the mechanic, is not an invention.

This brings me to the third and last claim, and probably the most important one in this controversy. It arises under the patent of October 23d, 1847. It is for an arrangement of the seat of the raker over the end of the finger-piece which projects beyond the range of fingers, and just back of the driving-wheel, in combination with and placed at the end of the reel, whereby the raker can sit with his back towards the team, and thus have free access to the cut grain laid on the platform and back of the reel, and rake it from thence on to the ground by a natural sweep of his body, and lay it in a range at right angles with the swath, thereby avoiding unevenness and scattering in the discharge of the wheat, and accomplishing the same with a great saving of labor. This improvement is particularly described by the patentee, and it is undoubtedly important that the jury should look into the description which the plaintiff has given of this improvement, and ascertain particularly what he claims he has invented, in order to be able to determine whether the improvement had or had not been before discovered or brought into public use, and, if new, whether it has or has not been infringed by the defendants.

The driving-wheel, says the specification, is placed further back than before, and back of the gearing which operates the cutter—the gearing which operates the crank being placed forward of the driving-wheel—thus balancing the frame of the machine with the raker on it, and making room for him to sit or stand on the frame, back of the driving-wheel with his back to the horses. The patentee then places the reel further forward towards the horses than before, and makes it shorter —it having before projected out over the fingers. He thus makes room for the raker to use his rake freely. The effect of advancing the reel forward is to open to the action of the rake the platform on which the grain falls, and, by shortening the reel, room is afforded for the operations of the raker himself. In consequence of the reel being shorter than before, a wheel-board is introduced, one end of which is fastened to the inside hound, and it is so curved as to force the grain upon the edge of the swath inward, so as to be caught by the reel in its revolutions. The wheel-board also prevents the grain from getting under the frame and being entangled in the gearing of the machine. It is important that you should bear in mind this description given by the patentee of his improvement, and carry it with you when you are comparing his arrangement with previous improvements, with a view of determining whether it is the same thing with them or substantially different.

It has been made a point, in the course of the trial, that the seat of the raker is the improvement and the novelty claimed by the patentee; that not only the seat on the frame, but the mode and form of its construction is also part and parcel of the invention; that, in this respect, there is a difference between sitting and raking, and standing and raking; and that the one does not necessarily involve the other. I have looked particularly into this branch of the case, because I have felt that it was the most important question involved, and that the claim in respect to it was the most meritorious one on the part of the plaintiff—more meritorious than either of the other contrivances—if he be entitled to any merit for his improvements.

Now, in order to ascertain. with reasonable certainty, what the patentee really be-

lieved he had invented, and for what he sought and obtained a patent. we must look into the description of the thing which he himself has given to the public. because there we must find his title, and there the public must look, after his term expires, to obtain the benefit of the use of his machine. From the description I have already given you, you see that the seat is not the thing which he claims in his description to have invented. The seat was the object and result he was seeking to attain, by the improvement which he supposed he had brought out. What he invented was, the arrangement and combination of machinery which he has described, by which he obtained his seat. That, and not the seat itself, constituted the essence and merit, if any, of the invention. What, then, was necessary, in order to obtain the benefit of this position for the raker? The difficulty before was, that the axle or shaft of the reel was perpendicular over the cutter, and the reel was thrown back very much over the platform. It was also extended on a line with the cutter, close up to the gearing, so that the end of the reel, extending to the side of the machine, interfered with a person placed behind the horses for the purpose of raking, and the reel, being too far back, interfered with the rake in its use. Thus, it appears that a seat was put on for the harvest of 1845, and some two hundred machines were made at Cincinnati for that harvest. That seat was put on without any change in the structure of the machine, except to fasten on the seat, extending from the front to the back. Those seats were put upon all the machines that were made for the harvest of 1845, but all agree that they went out of use generally, so great was the interference with the rake and raker, and it was that difficulty and obstruction that led to the subsequent modification of the machine. The reel was advanced in front of the cutters and shortened, and the driving-wheel was put back and the gearing forward, so as to balance the machinery with the weight of the raker on the end of the finger-piece.

It has also been supposed, that there was something in the idea that the patentee in his claim says: "I also claim, as my invention, the arrangement of the seat of the raker over the end of the finger-piece which projects beyond the range of fingers, and just back of the driving-wheel, as described, in combination with and placed at the end of the reel." He here claims the seat "as described;" but, on recurring to the description, we find the patentee saying that the driving-wheel is placed further back, and other changes are introduced, thus making room for the raker to sit or stand on the frame. It is this seat, as thus described, by which the raker may sit or stand on the frame and rake the wheat from the platform with convenience, that is claimed in the specification.

It is insisted, on the part of the defendants, that there is nothing new in this, because there is, in the machine of Hussey, a seat, or, what is equivalent, a position for the raker, in which he may stand and rake off the grain. The seat, that is. the position on the platform, is, in one sense. undoubtedly common to both. But, Hussey's machine has no reel to interfere with the raking, and the grain, instead of being raked from the platform, is pushed from the back part of it. The question is, whether the arrangement of the seat—the combination by which the patentee obtains and can use the seat or position—is similar to or substantially like the contrivance in Hussey's machine. That is the point. The mere fact that a seat was used in previous reapers, does not embrace the idea contained in this patent. That view could only be material under the assumed construction given by the counsel for the defendants to the patent, that it is for a seat. If that were the thing invented and claimed by the patentee, then the seat of Hussey would be an answer to the claim.

There is also another point to which it is proper to call your attention in this connection, and which has been the subject of discussion by the counsel, and that is, that Hussey, in the construction of his machine in Ohio, at a very early day, used a reel in connection with his cutter and a raker. It is insisted, that this use of the reel, in connection with a raker, in Hussey's machine, before the discovery of the plaintiff. destroys his claim to originality. In answer to this, it is claimed, on the part of the plaintiff. that the contrivance of Hussey into which the reel was introduced, was substantially different from the plaintiff's contrivance. It seems that Hussey's reel, like the reel of the plaintiff when his first seat was put on in 1845, interfered with the raker, so as to prevent his raking the grain the whole length of the platform. Hence, Hussey had an endless apron, by which the grain, when cut, was deposited at the feet of the raker. so that he could shove it off with his rake. Such was Hussey's contrivance for avoiding the difficulty that existed in the interference of the reel with the operations of the raker, by bringing the grain to the raker upon an apron, so that he should not be obliged to extend his rake in front of the reel. The next ground urged by the counsel for the plaintiff, in answer to this evidence to destroy the novelty of his patent. is. that Hussey abandoned and gave up that arrangement of his, as an unsuccessful experiment, and that, therefore, the idea which may have been and probably was in his mind, when he attempted to get up this contrivance for the benefit of the raker. was never completed or carried into practical effect, and that other contrivances were resorted to by him, in place of the reel, which he threw away and has not used since. It is not important, however, to take up your time with this last sug-

gestion, because it is clear that the arrangement of Hussey, when he used the reel in connection with his endless apron, did not touch or reach at all the modifications and alterations subsequently made by the plaintiff to accomplish the same end, but was altogether different in its operation. Hussey used the endless apron to get rid of the difficulty which the plaintiff avoids by putting his reel further forward, cutting off the end of it and introducing a wheel-board.

The next material question is, whether or not the defendants' arrangement of the seat or position for the raker is like that of the plaintiff, and whether or not the construction and use of it by them are an appropriation of his contrivance and an infringement of his machine. Now, I lay aside the mode of constructing these respective seats. I mean their form, whether they are constructed with the seat extending between the legs of the raker, with a front piece to support him, or with no seat between his legs and only a support around his body. I lay all that out of view, because I do not think the form of the seat is embraced in the plaintiff's invention. It may be of one form or of another, and it is very likely that the practical use of the machine by the raker is the only true test for determining what form of seat would be most advantageous and least injurious. The raker would work out the best form of seat, by actual trial. He might cushion the seat or make it of any form he pleased, but that would not enter into the invention or have anything to do with its merits. The invention is, the arrangement by which the raker can be placed where he is placed, standing or sitting, and do his work. You will then take up the defendants' machines, laying the seat out of view, and see whether their construction, arrangement and combination, for the purpose of obtaining a position for the raker on the machine, involves the combination of the plaintiff. If it does, then it is an infringement. If it does not, then it is an independent contrivance, and they are entitled to its enjoyment.

It is further claimed, on the part of the defendants, that, assuming all the positions taken by the plaintiff to be true, and that he is entitled to protection in the enjoyment of this improvement, as being its first and original inventor, yet he has forfeited it to the public, or has, at least, abandoned it to the benefit of the public, by his acts and conduct. Now, as there is no disagreement between the counsel upon the law applicable to this branch of the case, I will not take up your time by expounding the act of congress at large, but will assume the law to be as it has been laid down by the court in this circuit. Since the act of March 3, 1839 (5 Stat. 353), a patentee may make and vend or use his improvement or invention within two entire years before the time when he makes his application for a patent, without forfeiting or necessarily abandoning his right to a patent. As I understand this statute, and as, I believe, it has been generally construed and applied thus far in the several circuits, it virtually extends the patentee's privilege to sixteen years instead of fourteen; that is, he may use his improvement, by making and using his machines, and by vending and taking pay for them, for two years previous to his application for a patent, without forfeiting the benefits conferred upon him by his patent. But, if he either sells a machine or uses one, or puts one into public use, at any time more than two years before his application, it works a forfeiture of his right.

It is claimed by the defendants, first, that the plaintiff has forfeited his right in this case; and secondly, that he has abandoned it.

The plaintiff's application for the patent which was issued on the 23d of October, 1847, was made on the 3d of April, 1847. Any sale, therefore, or any use of the improvement, subsequent to the 3d of April, 1845, is protected by the statute of 1839, and cannot be relied upon as working a forfeiture. It is necessary, therefore, that the defendants should show a sale or putting into public use of the patented improvement prior to the 3d of April, 1845. That involves a question of fact. I have had some difficulty, on looking through the testimony, in ascertaining the precise time when the improvement embodied in the patent was made by the plaintiff. The exact time has not been shown, but it appears in evidence, and I have looked into this with great care, that this patented improvement in regard to the seat, as claimed by the plaintiff, was not in the machines constructed for the harvest of 1845. Those machines were made by Brown, by Magnes and by Zink. They had a board seat put upon them, without any change being made in the arrangement of the machine or of the reel, and had no wheel-board. That seat went out of use and was a failure. Of course, none of the machines with that seat, although used with the assent of the plaintiff, come within the rule of law in relation to the question of forfeiture, because they do not embody the improvement claimed in the patent, and it is that which must be put in use more than two years prior to the application, in order to work a forfeiture of the right. There was one machine made for the harvest of 1845, the one of which Chappell and Barnet gave an account, that was carried to Geneseo and Mount Morris in July, 1845, and operated there. It was the one which had a box upon it, and it also had a seat with a front-piece, there having been no piece in front of the raker in the other machines made for the harvest of 1845. But, although the Mount Morris machine had the seat thus arranged, it did not embrace the arrangement subsequently made, and de-

scribed in the patent of 1847. It was merely one of the old machines with the form of the seat changed; and, so far as I can gather the date, from my examination of the testimony, no machine, with the arrangement and combination described in the patent of 1847, was put into use or on sale until the harvest of 1846.

The next question is that of abandonment. The mere fact of making and selling an improvement or invention, or of putting it into public use, at any time within two years before the application for a patent, is not, of itself, an abandonment of the invention to the public. The right thus to use his invention before the granting of a patent, is a right conferred on the inventor by the act of 1839. Something more must be done within the two years—there must be some acts of the inventor, indicating an intention on his part to devote his improvement to the public in general, in order to authorize the jury to come to the conclusion that he has so abandoned it. It is for them to say whether the acts of the plaintiff within the two years, satisfy them that it was his design and intention to devote the invention to the public at large, as a gratuity, and without receiving a consideration for its bestowal.

It is proper for me to say, also, that those who rely upon the ground that a party has forfeited a legal right secured to him in due form of law, for the purpose of defeating his enjoyment of that right, must make out the point clearly and satisfactorily, beyond any reasonable doubt or hesitation; because, the law does not favor an abandonment, and throws upon the party who seeks to obtain the benefit of a forfeiture the burden of proving it beyond all reasonable question.

I have thus gone through with the three claims, the divider and the reel-post in the patent of 1845, and the raker's seat in the patent of 1847. If you are with the plaintiff on either one of these claims, you are entitled to your verdict. You will take them up, one by one, and decide whether or not the plaintiff has made out his title to them as inventions, and also, whether or not the defendants have violated his rights. If you find for the plaintiff on any one of the claims, he is entitled to your verdict; and, if you find for the defendants on all of them, your verdict will be for the defendants.

The only remaining question is that of damages. The rule of law on this subject is a very simple one. The only difficulty that can exist, is in the application of it to the evidence in the case. The general rule is, that the plaintiff, if he has made out his right to recover, is entitled to the actual damages he has sustained by reason of the infringement; and those damages may be determined by ascertaining the profits which, in judgment of law, he would have made, provided the defendant had not inter-

fered with his rights. That view proceeds upon the principle, that if the defendant had not interfered with the patentee, all persons who bought the defendant's machine would necessarily have been obliged to go to the patentee and purchase his machine. And the profits that the patentee might have made out of the machines thus unlawfully constructed, present, therefore, a ground that may properly aid the jury in arriving at the damages which the patentee has sustained.

It has been suggested by the counsel for the defendants that, inasmuch as the claims of the plaintiff in question here are simply for improvements upon his old reaping machine, the patent for which expired on the 21st of June, 1848, and not for an entire machine and every part of it, the damages should be limited in proportion to the value of the improvements thus made; and that, therefore, a distinction exists, in regard to the rule of damages, between an infringement of an entire machine and an infringement of a mere improvement on a machine. I do not assent to this distinction. On the contrary, according to my view of the law regulating the measure of damages in cases of this kind, the rule which is to govern is the same whether the patent covers an entire machine or an improvement on a machine. Those who choose to use the old machine in this case, have a right to use it without incurring any responsibility. But if they engraft on it an improvement secured by a patent, and use the machine with that improvement, they have deprived the patentee of the fruits of his invention, the same as if he had invented the entire machine; because, it is his improvement that gives value to the machine, on account of the public demand for it. The old instrument is abandoned, and the public call for the improved instrument, and the whole instrument, with the improvement upon it, belongs to the patentee. Any person has a right to use the old machine, but, if an inventor engrafts upon the old machine which he has a right to use, an improvement that makes it superior to anything of the kind for the accomplishment of its purposes, he is entitled, under a patent for the improvement, to the benefit of the operation of the machine under all circumstances, with the improvement engrafted upon it, to the same degree in which the original patentee was entitled to the old machine.

There are some data furnished by the counsel on both sides, which it is proper the jury should take into view, in ascertaining the damages, provided they arrive at this question in the case. It is conceded that just three hundred machines have been made by the defendants, of the description to which I have called your attention, and testimony has been gone into on both sides, for the purpose of showing the cost of the machines, and the prices at which they sold. In

order to ascertain the profits accruing to the party who makes machines of this description, you must first ascertain the cost of the materials and labor, and the interest on the capital used in the manufacture of the machines. You must also take into account the expense to which the manufacturer is subjected in putting them into market, such as that of agencies and transportation and insurance; and, where the article is sold on credit, a deduction must also be made for bad debts. All these things must be taken into account, in order to bring into the cost every element that properly goes to constitute it in the hands of the manufacturer. When you have ascertained the aggregate sum of the cost, deduct it from the price paid by the purchaser, and you have the nett profit on each machine. By this process you are enabled to approximate to something like the actual loss that the patentee sustains, in a case where his right has been violated by persons interfering with him and putting into market his improvement. There is considerable difference between the witnesses for the respective parties, in their testimony as to the cost of constructing the machine. I believe that the witnesses on the part of the plaintiff brought down the cost to thirty-seven dollars on each machine, and stated the nett profit on each to be, on an average, over sixty dollars; while the witnesses on the part of the defendants put the cost at some sixty-seven dollars, including work, labor and expenses, and some made it even higher than that, including the expense of collecting debts and of agencies. It appears that the machines have been sold at prices varying from one hundred dollars, for cash, up to one hundred and twenty dollars and one hundred and twenty-five dollars, on credit, depending somewhat upon the place to which they have been sent. Many have gone to a considerable distance into various states, and there is a difference in the price of the machines, whether they are bought at the factory or at distant points.

The question of damages will depend upon the good sense and sound judgment of the jury, upon the facts which have been introduced to show the loss which has been sustained by the patentee, or, in other words, the profits he would have made if the infringement had not occurred. The plaintiff will be entitled, provided, on an accurate estimate, you can arrive at the actual damages, to interest on them from the commencement of the suit in August, 1850; and, in addition to all this, if the jury are satisfied that the plaintiff has sustained damages beyond those arising from the actual interference of the defendants in making and putting into market similar machines, they will be justified in allowing them. I allude now to the publications by the defendants, disparaging and denouncing the improvement of the plaintiff, in connection with their infringement by making and vending the article, and while

they were thus engaged in the violation of the patent. This question of damage is very much at large, and rests in the sound discretion of the jury. It is always much easier to calculate large profits upon paper than it is to realize them by practical experience in the business of mankind. The question, therefore, is one which the jury must decide with caution, care and prudence, and they must confine the measure of damages to the fair and actual loss which the patentee has, in their judgment, sustained, on account of the infringement by the defendants.

The jury failed to agree upon a verdict.

At the October term, 1851, at Albany, before Mr. Justice NELSON, the case came on again for trial, when the defendants moved its postponement on account of the absence of a material witness in regard to the patent of 1845. The court holding that sufficient cause for a postponement had been shown, the plaintiff waived all claim to recover in the suit upon the patent of 1845, and the court directed the trial to proceed upon the patent of 1847 alone. The evidence given on both sides, as to the latter patent, was very much the same as on the previous trial, and the charge of the court was substantially the same. The jury found a verdict for the plaintiff, for $17,306 66.

NOTE. Judgment having been entered on this verdict, the defendants carried the case by writ of error to the supreme court, where it is reported as Seymour v. McCormick, 16 How. [57 U. S.] 480. That court reversed the judgment, on the ground of misdirection by the court below, in its charge as to the rule of damages, but sustained its other rulings.
[This cause again came before the court solely on the patent of January 31, 1845. Case No. 8,-727. For other cases involving this patent, see McCormick v. Seymour, Case No. 8,727; McCormick v. Manny, Id. 8,724; McCormick v. Talcott, 20 How. (61 U. S.) 402; Seymour v. McCormick, 19 How. (60 U. S.) 96.]