SIMMONDS *et al. v.* MORRISON *et al.*

*(Circuit Court, S. D. Ohio.* January 24, 1891.)

1. PATENTS FOR INVENTIONS—NOVELTY—DASH-RAILS.
   Letters patent No. 339,307 were issued to Robert W. Logan, April 6, 1886, for a detachable dash-rail, to be fastened to leather-covered dash-boards by means of clamps. Patents for rails for wooden dash-boards substantially similar, except as to the mode of fastening, had been previously issued; and various kinds of attachments had been fastened to leather-covered dashes in substantially the same manner as complainant fastened his dash-rail. *Held* that, as both the form of complainant's dash-rail and his method of fastening it were old, the fact that he had applied the fastening device to a new use did not constitute a patentable novelty, and that his patent was void.

2. SAME—ESTOPPEL.
   The fact that defendants have appropriated complainant's device bodily, and have used it and sold it in preference to prior structures, does not estop them from questioning its patentability.

3. SAME—ANTICIPATION—EVIDENCE.
   In an action for the infringement of the patented dash-rail, testimony of one of the defendants, who is corroborated by several disinterested witnesses, that he had made a dash-rail identical in form, application, and conception with that described in the patent sued on, some 12 years before its issuance, is sufficient to establish an anticipation of complainant's patent, though defendant made but the one dash-rail, and then ceased their manufacture until after the issuance of the patent.

In Equity.

This suit is for the infringement of a patent for a rail for dash-boards, issued April 6, 1886, to Robert W. Logan, complainants' assignor, being No. 339,307.

The object of the patented device is declared in the specification to be "to provide a rail which can be quickly and easily attached to any dash-board after it is otherwise complete, and also easily detached when it is desired to do so, (as when it needs replating,) thus making a more desirable rail, and one which can be used on the cheaper grades of vehicles, giving them the well-known advantage of the rail, with but slight addition in cost."

The specification further provides that the dash-board may be of any ordinary and desired construction. The rail is mounted, and extends along the top edge, and down a short distance on each end, to form handles, as is usual. It is secured in position by supports on the top and at the ends. These should be sufficient in number to properly support it from the top of the dash, two being shown in the drawings. They are preferably formed integrally with the rail, extending down therefrom far enough to support it the desired height from

the edge of the dash-board. Two lips are formed on the lower end of each support. These extend down on each side of the top edge of the dash to a point just below the center of the bulge therein, and thus, after the rail has been put in position, a slight blow on these points operates to bend them in under the bulge of the dash, and aid in securing it in position. The supports are clamped to the ends of the dash-board at one end, and have the lower ends of the rail secured to their outer ends. The clamp part preferably consists of two jaws, which extend back on each side of the end piece of the dash-board frame to the rear thereof, and are provided with bolt-holes in their ends for the bolts, which pass through said holes and the dash-board, and by means of nuts tightly clamp the jaws to the end piece, and secure the support in position. The patentee states that he does not desire to limit himself to any specific form of clamp. In their outer ends the supports are preferably provided with vertical holes, through which the lower ends of the rail are inserted, they being secured therein by nuts on their lower ends, as shown in the drawings. He suggests that the supports might be formed in piece with the rail, or secured thereto in any other manner, without departing from his invention; but he regards the construction shown as preferable, as by means of the nuts the rail can be drawn down tightly upon the top edge of the dash, and thus made secure and rigid in position.

He also shows a rail formed in two parts, adapted to screw together in the central portion, thus rendering it adjustable to dash-boards of various lengths, whereby it can be easily and quickly applied to any vehicle, without fitting or extra expense.

He also shows the top part of the rail dispensed with, and only the ends attached by his improved means, to form handles, and states that by his construction a rail is provided, not only much cheaper to put on, but one that is easily detached when desired, as, when the plating becomes worn off, it can be at once removed, replated, and readjusted in position without injuring the dash in any manner, thus making a desirable and cheap rail. He makes this further statement:

"I am aware that supplemental dash-boards have been secured to the dash-board proper by being clamped to the top edge thereof, and said dash-board thus rendered more effective, but I do not regard this as a substitute for my invention, which is equally applicable to and desirable on said supplemental dash-board when used as on the dash-board proper. As will be readily seen, if at any time it is desired to use such supplemental dash-board on a dash-board provided with my rail, said rail can be readily removed, placed upon said supplemental dash-board, and the whole put in position."

The first and second claims, which are alleged to be infringed, read as follows:

"(1) The combination, with a dash-board consisting of the ordinary metallic frame and leather covering, of a detachable rail provided with supports having clamps, whereby it is secured to the finished edges of said dash-board, and held free therefrom, substantially as shown and described:

"(2) The combination, with the dash-board, A, of the rail, B, provided with the supports, B$^1$, engaging with the top edge of said dash-board, and the sup-

ports, B², engaging with the ends of said dash-board at one end, and being secured to the ends of said rail at the other, substantially as set forth."

*C. & E. W. Bradford,* for complainants.
*John W Strehlie,* for defendants.

SAGE, J., (*after stating the facts as above.*) From the state of the art as exhibited in the evidence in this cause it appears that before the introduction of leather-covered dashes, wooden dash-boards were used, especially in light vehicles; and dash-rails attached to the finished wooden dash-board were patented as long ago as July, 1870, to Noyse and Stratton, No. 105,362. There is shown in that patent a dash-rail with supports to hold it free from the finished edges of the dash-board, and to attach it to the board. The supports have only one lip, instead of two, as in the patent sued on, and the dash-rail is attached to the dash-board by means of a screw and nut. Another form of rail, standing free from the finished wooden dash-board, and secured thereto by posts and supports, is shown in patent to Warner, No. 128,933, July 9, 1872; and still another in patent to Munson, No. 149,878, April 21, 1874. These patents make it clear that the rail and the form of the rail of complainants' patent are old.

Clips of various kinds to hold attachments to leather-covered dashes were old and in common use before the date of the alleged invention described in complainants' patent. In patent No. 264,145, September 12, 1882, to Gibbs, for rein-holder, there are shown supports connected by a small rail or cross-piece, and clipped to the finished edge of a leather-covered dash-board. The specification sets forth that the device is capable of being attached upon the dash-board of any vehicle. The base is a curved or narrow casting, in the shape of an inverted U, the wings of which have openings at each end, provided with thumb or set screws for attaching them to the dash of the vehicle. Fig. 3 of this patent shows a device not differing in any essential degree from that shown in Fig. 2 of the patent in suit.

There is also shown in patent No. 263,908, September 5, 1882, to Howell and Burdick, for rein-holder, a clip-spring for attaching the holder to the dash-board, which is a complete anticipation of the clip shown in complainants' patent. Patent to Kinlock, April 26, 1881, No. 240,-732, for supplementary dash-board for vehicles, designed to keep out of the vehicle body the dust, mud, etc., flung by the horse in traveling, shows a rectangular or other shaped shield or fender, provided with clasping or clamping devices at one edge, whereby it may be readily set, and securely, but removably, held upon the ordinary dash-board of a vehicle at the elevation and angle required. This, too, is a complete anticipation of the complainants' clip.

Patent to Peters, No. 225,019, March 2, 1880, shows a fastening attachment for vehicle dashes, which is also a complete anticipation of the complainants' clip. It shows a clip and foot adapted to grasp a half-round rod. The clip is bolted above and below the dash-rod, and shows a concave bearing placed between the dash-rod and the dash-foot

proper, and extending upwardly and downwardly, so that the bolts securing the clip in position pass through this concave bearing, and keep it also in position. The clip is in the shape of a horseshoe, with a screw-thread cut on each end. These ends pass through the dash-foot, and are secured in place by nuts. This, too, is a complete anticipation.

But it is urged for the complainants that none of these devices would serve the purpose of that described in the complainants' patent. Thus it is said that no dash-board rail is shown or described in the Peters patent, and that the Kinlock patent differs from that shown in the complainants' patent in this: that the clasping or clamping devices are not adapted to embrace closely the upper part of the frame of the dash-board, but extend down along the dash-board, so as to form a sufficient leverage to hold the shield and supplementary dash-board at the proper angle; also that, there being no provision for handles at the ends of the dash-board, as in complainants' patent, they being wholly wanting, and the device shown in Kinlock not being a dash-rail in any sense of the word, it does not anticipate. Similar distinctions are drawn between the complainants' device and that shown in the Howell and Burdick patent and in the Gibbs patent. In other words, the claim is, in substance, that because the complainants have applied this old device to a new use, they are entitled to a patent, and, inasmuch as the complainants' improvement displays novelty and utility, they are entitled to a decree.

These propositions are so utterly unsound, and so in conflict with the authorities, that it is not worth while to enter upon any extended consideration of them; but it is a proper occasion for two or three observations with reference to some authorities cited. Judge NELSON's charge to the jury in *McCormick* v. *Seymour*, 2 Blatchf. 240, that "novelty and utility in the improvement seems to be all that the statute requires as a condition to the granting of a patent," is cited. This quotation does not, of itself, convey the true and full meaning of the charge. In the sentence immediately preceding he says that "the improvement upon a machine, which is the kind of invention here, must be new, not known or in use before, and must be useful,—that is, the person claiming the patent must have found out, created, and constructed an improvement which had not before been found out, created, and constructed by any other person; and it must be beneficial to the public, or to those persons who may see fit to use it." In another part of the charge he says that, "in order to take the separator of the defendants out of the charge of infringement, it is necessary that they should satisfy you that it is substantially and materially different from the plaintiff's; in other words, that it involves some new idea in its construction not to be found in the plaintiff's. If it is found there, of course it is an appropriation of his invention; if not, then it is an independent improvement, and not in violation of the plaintiff's right." Again: "If the defendants have taken the same general plan, and applied it for the same purpose, although they may have varied the mode of construction, it will still be, substantially, and in the eye of the patent law, the same thing." And, again,

referring to the defendants' device, he says: "If it embodies the same ideas, and its arrangement carries out the same idea,—if this is the true view of the question involved,—then undoubtedly it is an infringement."

Taking all these together, it may well be insisted that when he spoke of novelty and utility he referred to inventive novelty, and not mere novelty in construction. But if the citation made by counsel expresses correctly the statement of the law by Judge NELSON, all that it is necessary to say about it is that he has been overruled again and again. The case before him was under the act of July 4, 1836, and the question discussed raised under section 6 of that act.

In *Thompson* v. *Boisselier*, 114 U. S. 11, 5 Sup. Ct. Rep. 1042, the supreme court say that a patentee must be an inventor, and he must have made a discovery, and that the statute has always carried out this idea. The court then say:

"Under the act of July 4, 1836, (5 St. p. 119, § 6,) in force when these patents were granted, the patentee was required to be a person who had 'discovered or invented' a 'new and useful art, machine, manufacture, or composition of matter,' or a 'new and useful improvement in any art, machine, manufacture, or composition of matter.' In the act of July 8, 1870, (16 St. p. 201, § 24,) the patentee was required to be a person who had 'invented or discovered any new and useful art, machine, manufacture, or composition of matter, or any new and useful improvement thereof;' and that language is reproduced in section 4886, Rev. St. So it is not enough that a thing shall be new, and in the sense that in the shape or form in which it is produced it shall not have been before known, and that it shall be useful, but it must, under the constitution and the statute, amount to an invention or discovery."

The same subject is discussed in *Gardner* v. *Herz*, 118 U. S. 180, 6 Sup. Ct. Rep. 1027, and in cases *passim* from that time down until now. 1 Robinson on Patents, from page 210 to 228, is referred to in support of the proposition, but it is sufficient to quote from note 2, on page 228:

"A combination may result either from mechanical ingenuity and experiment or from the exercise of inventive skill. In the latter case only is it an invention, and the subject-matter of a patent."

An excellent statement of the law on this subject was made by Judge SHIPMAN in *Stanley Works* v. *Sargent & Co.*, 8 Blatchf. 344, and 4 Fish. Pat. Cas. 445:

"Utility is not an infallible test of originality. The patent law requires a thing to be new, as well as useful, in order to entitle it to the protection of the statute. To be new, in the sense of the act, it must be the product of original thought or inventive skill, and not a mere formal and mechanical change of what was old and well known. But the effect produced by a change is often an appropriate, though not a controlling, consideration in determining the character of the change itself."

The proposition made by counsel for the complainants that the defendants, having appropriated the complainants' device bodily, and used and sold it in preference to prior structures, are estopped from questioning its patentability, is as novel as it is unsound. The facts referred to are strong evidence of utility; but to establish that they would create an estoppel, as claimed, would convert the patent law into a mere contrivance to promote monopolies, and there would be nothing for the court

to do in any like case but to enter a decree for the complainant, without reference to the validity of his patent.

Even if the views above expressed, that the novelty of the complainants' device is not sufficient to sustain their patent, be set aside, the case is clearly against them.

There is shown in evidence a device which in conception, form, and application is identical with that described in the patent sued upon. The testimony is that this exhibit shows a rail exactly like the one made by the defendant Joseph Morrison at some time between the years 1872 and 1874 for John Roberts, carriage maker, then doing business on Sixth street, in Cincinnati. His testimony is that an apprentice boy, whose name was Phares, brought a covered dash to his shop, with orders to put a rail on it. The statement made by Phares at the time, as Morrison testifies, was that the dash-frame should have been constructed with a welded rail on it, plated, but by mistake that had been omitted. Morrison took the dash, and, after examining the manner and form in which the whip-socket (shown in Exhibit No. 4, which, it is in evidence, was used in 1880) was fastened to the dash-frame, (which, as shown in Exhibit No. 4, was attached to the dash-frame by a clip, which also is a complete anticipation of complainants' device,) he made the rail as shown in Exhibit No. 1, and delivered it to Roberts. He testifies that he is unable to fix the date more specifically, because all his account-books were destroyed subsequently by fire. He further says that the dash-rail of that exhibit was secured to the dash-frame by means of clips and screws, as shown in the exhibit, which is precisely the mode of attachment of complainants' rail; and that Henry Phister, lock-smith on Sixth street, Cincinnati, tapped the holes in the clips that held the rail to the dash. He also testifies that that was the only detachable dash-board rail of that sort which he made, and that the reason he made no other was that the rail was not substantial enough, in that the clamps were not fastened tight enough to the dash-rail. He also testifies that he saw that dash, with the rail in position, on a vehicle in Roberts' place of business.

Morrison is corroborated by William H. Phares, who is now a fireman in the Cincinnati fire department; by Henry Phister, the locksmith; by the defendant Corcoran; and by John H. Shobrook. Mr. Roberts died in the summer of 1887.

Phares testifies that he worked for Roberts at the time stated by Morrison; that the facts occurred as detailed by him; and that the finished dash and rail were similar to Exhibit No. 1, excepting that they were filed and finished up in better shape. He fixes the time as in September or October, 1873.

Phister testifies that he drilled holes on some clamps "on a little job" like Exhibit No. 1, for Morrison, and that it was in 1873, and that he understood at the time that they were intended to hold a rail over the top of a dash-board.

Corcoran, Morrison's partner and his co-defendant, also saw the rail in 1873, and testifies that it was similar to Exhibit No. 1.

Shobrook, carriage maker and blacksmith, says that some 13 or 14 years ago he saw a dash with rail like Exhibit 1, which was made by Morrison for Roberts, by whom Shobrook was then employed, and that to the best of his knowledge and belief it was placed on a vehicle.

There was an effort made to discredit Morrison by showing that he is contradicted by three witnesses as to what occurred with Simmonds (complainant, and one of the three witnesses) at an interview in 1885, but he is so strongly corroborated that I entertain no doubt of the substantial truth of his testimony concerning Exhibit No. 1, nor that the dash-rail he made in 1872 or 1873 was used on a vehicle. It cannot be regarded as nothing more than an abandoned experiment. It is a complete anticipation of every feature of the device patented under which the complainants claim.

The bill will be dismissed, with costs.