## GRAHAM *v.* McCormick and others.

*(Circuit Court, N. D. Illinois.* March 13, 1880.)

**1. PATENTS FOR INVENTIONS—PUBLIC USE AND SALE—RULE OF.**

In order to determine whether a case is within the rule relating to two years' public use or sale of an invention, it is necessary to consider whether the particular devices sold or used, which the inventor claims to have invented, were perfect, so that they embodied a complete invention.

**2. SAME—TIME TO RUN BEFORE DATE OF SECOND APPLICATION.**

Where an invention is withdrawn from an application for a patent, and described and claimed in a new application by the same inventor, and patents issue on both, the two years within which the invention claimed in the patent issued on the second application could be sold and publicly used, without invalidating such patent, will be considered as beginning to run two years before the date of the first application, and the first application will not be sufficient to break the continuity of the proceeding which originates in that application, or change the rule as to the inventions claimed in the patent issued on the second application, so as to require that the two years shall be considered as beginning to run two years before the date of the second application.

**3. SAME—SALE AND USE ON TRIAL—PRACTICAL TESTS.**

Where a machine is sold and used on trial, while the invention is imperfect and largely in experiment, and it is necessary for the inventor to have the help of others in testing it, such conditional sale or use should be considered as a use of the invention for such practical tests as the law permits an inventor to make, and not as such a public sale or use as will be sufficient to invalidate a patent.

**4. PATENTEE—RIGHTS OF—MATTERS DESCRIBED IN FORMER PATENT.**

On general principles, where a person has, within the meaning of the patent law, made an invention which he has described in an application for a patent, and a patent has been issued on such application for other matters of invention, he should not be precluded for that reason alone from applying for and obtaining a patent for that which was described but not claimed in the first patent.

**5. JOINDER OF PARTIES—LEGAL TITLE—PRACTICE.**

The objection that all the parties interested in the patent are not joined as complainants will not be regarded favorably, when it appears that the legal title is in the complainant, and that the only interest claimed to be vested in the parties not joined is based on an old contract and assignment which have long lain dormant.

**6. PATENT FOR HARVESTER—INFRINGEMENT OF.**

The first and second claims of the harvester patent No. 74,342, issued to Alvaro B. Graham, February 11, 1868, *held* to be valid, and to be infringed by the machine described in patent No. 193,770, issued to McCormick, Baker, and Erpelding, July 31, 1877.

In Equity.

This case was argued before the circuit judge and Judge DYER, of the eastern district of Wisconsin, the parties having requested the latter to sit with the circuit judge in this case, inasmuch as a case

involving the same questions under the patent had been heard by him at Milwaukee and was yet undecided. Judge DYER did not officially sit in this case, but he heard the arguments and participated in the consultation, after which the following opinion was delivered, which, although given by the circuit judge, may be regarded as the joint opinion of both.

*Banning & Banning,* for complainant.

*E. N. Dickerson, M. D. Leggett,* and *Offield & Towle,* for defendants.

DRUMMOND, C. J. This is a bill filed by the plaintiff as assignee of A. B. Graham, to whom a patent was issued on the eleventh of February, 1868. The controversy arises only upon the first and second claims of that patent. Various objections have been made to the patent, and to the right of the plaintiff to maintain suit thereon.

It is objected by the defendants that the Graham patent is invalid because the invention was in public use and on sale for more than two years prior to the application for a patent. The first conception in the mind of the patentee seems to have been in the winter of 1862–3, and during the year 1863 he made an arrangement with certain parties under which some machines were constructed containing his invention, which, however, proved unsuccessful. Under an arrangement made with another person in the following year, several other machines were constructed, parts of the old machines of 1863 being used in the construction of some of the new ones. Conditional sales were made of some of these machines, and with a few of them some grass or grain was cut. They were continually getting out of repair and could not be regarded as a success, and in some instances, where money had been paid for the machines, it was refunded in whole or in part.

It is insisted on the part of the defendants that these facts constituted a sale and use of the invention for more than two years prior to the application for the patent, while on the part of the plaintiff it is claimed that it was nothing more than testing, by experiment in various ways, whether the invention was successful. In order to a proper understanding of this part of the case it is necessary to consider the history of the application for the patent.

That was first made on the twenty-fifth of February, 1864, by being placed in the hands of solicitors in New York, to be by them presented to the patent-office. The application, however, for some unexplained reason, was not in fact filed there until the second of December, 1865. The patentee claims that instructions were given to the so-

licitors to file the application at once, and he supposed that it was so filed. It contained five claims, the first of which embraced the invention now in controversy. On the thirtieth of December, 1865, the first three claims were rejected, an offer being made at the time to allow the other two claims. This offer was not accepted, and on the twenty-fourth of March, 1866, an amended claim was filed in place of the first rejected claim. It is understood that this referred to the invention now in controversy. On the fourth of April, 1866, this claim was rejected. On the eleventh of February, 1867, the first application being still pending, with the action of the patent-office as stated, a second application was filed, containing, among others, the two claims now in suit. In June, 1867, the claims which embraced the invention now in controversy were withdrawn from the first application, and on the twenty-third of July, 1867, a patent was issued on the first application. As issued, that patent did not include the invention now in suit. A patent for the invention in controversy now was issued on the second application on the eleventh of February, 1868. A description of the invention now under consideration was contained in the original specifications and drawings which accompanied the first application.

It is claimed by the plaintiff that under this state of facts the application for the patent embracing this invention, for the purpose of fixing the time when the two years should begin to run, should be considered as having been made on the twenty-fifth of February, 1864, when the patentee's first application was put in charge of his solicitors; or, if that be not so, that it should be considered as made when that application was filed in the patent-office on the second of December, 1865, so that the two years would embrace the years 1864 and 1865. On the other hand, it is contended by the defendants that the two years began to run on the eleventh of February, 1865, because the second application, upon which the present patent was issued, was filed on the eleventh of February, 1867, and that the connection between the first and second applications was effectually broken, under the circumstances, so that the two applications could not be considered one continuous proceeding.

The rule is well understood that if an invention has been in public use or on sale, with the knowledge and consent of the inventor, more than two years before his application for a patent, it will render the patent invalid; but it is clear that, in order to determine whether the case is within the rule, we must consider whether the particular devices which the inventor claims to have invented were perfect, so

that they embodied a complete invention.  We have some doubts, even upon the theory that the two applications should be considered as parts of one and the same proceeding, whether the patentee's first application can be regarded as made, within the meaning of the law, at the time it was placed in the hands of his solicitors in February, 1864; but we think, under the circumstances which attended the efforts of the patentee to obtain a patent, together with the connection which the second application seems to have with the first, that, for the purpose of fixing the time when the two years began to run, the second application should be treated as a continuation of the first, and that both are part of one proceeding.

In this respect this case is not wholly unlike that of *Smith* v. *Goodyear Dental Vulcanite Co.* 93 U. S. 500, where the court held that the effort to obtain a new patent in 1864, ought not to be regarded as disconnected from the original application made in 1855, and that it was but one stage in a continuous effort.  It is true in this case, unlike that, a patent was granted on the first application covering the claims which were not rejected, and the patent in suit was granted on the second application; but the subject-matter of the second application was embraced in the first, and the invention now in controversy was described in the specifications and the drawings which constitute part of the first application, and we think it may be said that the continuity of the proceeding which originated in the first application was not broken, up to the time when the patent for the invention in suit was granted in 1868.   See, also, *Blandy* v. *Griffiths*, 3 Fish. 616.

In view, therefore, of the circumstances under which Graham made his second application and withdrew from the first the claims covering the invention now in suit, we cannot say that the proceedings should be severed, so as to make the two years date back from the eleventh of February, 1867; and we think that the two years within which the invention could be sold and publicly used without invalidating the patent, began to run on the second of December, 1863, which was two years prior to the filing of the first application.   It is manifest that the only machine made in 1863, which is distinctly proved to have been sold, was delivered on trial and warranted, and should be regarded rather in the light of a use of the invention for such practical tests as the law permits an inventor to make, than as such a public sale or use as is contemplated by the statute.   At that stage of the inventor's work his invention was largely in experiment and trial.   It could only be tested by practical use in the field, and

it was essential that it should be so tested by farmers on their farms. The inventor was then struggling, as inventors often do, to establish the success of his invention. It was necessary that thorough experimental tests should be made, and that he should have the assistance of others in making them; and it is manifest, we think, that the machines of 1863 were not yet so perfected as to be practical machines, capable of successful work.

In the light of all the testimony we conclude that what was done by the patentee, with reference to the use of the machines in 1863, was intended by him, and was in fact, for the purpose of experiment, and as a test of the machines with a view to their perfection. This part of the defence rests upon a claim of forfeiture of rights secured by the patent. To justify the court in sustaining it the proof should be clear and satisfactory; the right of the infringer to invalidate the patent for this cause should be undoubted. And in view of these considerations we think the patent should be held valid against this objection.

It is insisted further by the defendants that the plaintiff's patent is invalid because the first application for a patent included the invention which is the subject of the two claims in controversy covered by the patent of 1868; and because that invention was not allowed in a previous patent, but the previous patent was issued for other claims, that the second patent, of 1868, is inoperative. And it is said that instead of there being a new patent issued in the case there might have been a reissue of the original patent; and it is also insisted that the second patent was issued for something in addition to what was claimed in the previous patent, which claim was rejected, and the second patent is invalid on that account.

Admitting the facts to be as stated by the defendants, is the conclusion drawn from them correct? We think it is not. It was not a proper case for a reissue. There was no defective or insufficient specification. The inventor had not claimed more than he had a right to claim as new. The case as it is put is one where there was the description of an invention which was not claimed, the claims in controversy here having been withdrawn, and where we must assume that the person was entitled to a patent, inasmuch as the office subsequently granted him a patent for the invention described. On general principles, we think that where a person has, within the meaning of the patent law, made an invention which he has described in specifications, including other matters of invention, for which last a patent has been issued, that he should not be precluded for that

reason alone from applying for and obtaining a patent for that which was not claimed in the first patent. The object of the patent law was to protect a party who made an invention which was useful, provided he complied with the terms of the law and a patent issued for the invention; and unless there is something in the law which declares a patent issued under such circumstances to be invalid, it is the duty of the courts to sustain a patent for an invention thus made. It is to be borne in mind that the application for the second patent, that of 1868, the one in controversy here, was made while that for the previous patent was pending, and before the prior patent had been issued. There were thus pending before the patent-office two applications at the same time, where the claims were different, and we understand it to be in accordance with the practice of the patent-office to allow applications to be made at the same time, by the same party, for different parts of the same machine.

It is also insisted by the defendants that the plaintiff cannot maintain the suit because the inventor had not the right to assign to him the whole interest in the invention under the patent of 1868. On the twenty-fifth of November, 1865, A. B. Graham, the inventor, made a contract with W. B. & C. A. Werden that they should have the exclusive right to manufacture and sell the improvement in the machine, and that that right should continue until the patent about to be applied for expired; and Graham agreed that, before the letters patent should issue for the invention, he would make such necessary assignment that the patent might issue to all the parties jointly, each to have an undivided one-third interest therein. It will be observed that this was not of itself an assignment, but only an agreement to assign. On the same day that this contract was made, what purported to be an assignment was executed by Graham. It stated that whereas Graham himself and the Werdens had agreed to purchase from Graham all the right, title, and interest which he had in the invention, through the grant of the letters patent therefor, therefore he, Graham, assigned to himself and the Werdens the full and exclusive right to said invention of all the improvements made by him, as fully set forth and described in the specification which he had prepared for the purpose of obtaining a patent. The circumstances connected with the application and obtaining the respective patents have been already stated. On the twenty-third of July, 1867, in pursuance of the contract and assignment already referred to, letters patent were issued to Graham and the Werdens. That patent is not the subject of controversy here. On the eleventh of February, 1868, a patent

was issued, which included the two claims in controversy here, to A. B. Graham alone.

It is claimed by the defendants that these facts show that A. B. Graham could not assign to the plaintiff a right to enable him to maintain this suit in his own name on the patent of 1868.

The evidence tends to show that a controversy arose between A. B. Graham and the Werdens as to the contracts of November 25, 1865. The former insisted that the Werdens had not complied with their contract, and from that or some other cause there seems to have been no additional assignment made to the Werdens of any interest in the patent of 1868; and, as already stated, that patent was issued to Graham alone. We think that upon this state of facts, there being no controversy about the validity of the assignment by A. B. Graham to the plaintiff of the patent of 1868, that the plaintiff must be considered as having the legal title to that patent, and consequently has the right to maintain this suit in his own name. Whatever equities there may be between the parties to the contract of November, 1865, can be adjusted in a controversy between themselves or their legal representatives. We do not think that the defendant can claim that the facts stated constitute a defence to this action.

The two claims of the Graham patent which are alone in controversy here are the first and second. The first claim is for a combination of the finger-beam with the gearing carriage by means of the vibratable link, the draft-rod, and the two swivel joints, M and M', so that the finger-beam may both rise and fall at either end and rock backward and forward; and the second claim is the same as the first, with this only added: that an arm is attached to the vibratable link, by which the rocking of the finger-beam is controlled by the driver. The object of this invention, as set forth in these two claims, seems to be mainly to produce the rocking motion of the finger-beam as described, and by the method described.

In the Ball patent, while there may be said to be something equivalent to the swivel joint, M, of the plaintiff's machine, where it is attached to the frame, and also something similar to the draft-rod and the arm, there is nothing to produce the rocking motion, which is the essential object in the first two claims of the plaintiff's machine; and consequently there is no swivel joint, M', as in the plaintiff's machine, so that there is nothing in the Ball machine to prevent the validity of the combination in the first two claims of the plaintiff's patent.

The Zug machine has, if not a swivel joint like that of the plaintiff's at M, where connected with the frame, something which seems substantially similar. It has a vibratable link, and it has something which is equivalent to the draft-rod, the main difference being that it is attached beneath the shoe, instead of above, but there is no swivel joint, M'. There is an arm which is attached to the draft-rod and shoe, by which it can be raised and lowered; but Zug claims in his patent that when the machine is in progress over the field, and when the finger-bar strikes any obstacle, there is a device in a box, in which the forward part of the draft-rod is fastened, by which the finger-bar yields to the obstacle; and that there is also a mode by which the vibratable rod is attached to the frame, called "joint 16" in his patent, and what has been termed an open clevis, where the vibratable link is connected with the draft-rod, by which a motion is given to the finger-bar, and thus the finger-bar is relieved from the obstacle. Zug does not claim that the finger-bar in his machine has a rocking motion, but only that the mode by which the draft-rod is fastened, and the motion given to the finger-bar, prevents the obstacle which the machine may meet from doing damage to it.

These seem to be the main differences between the two machines, and the question is whether there is anything in the Zug machine to prevent the combination named in the first two claims of the plaintiff's patent from being valid. The defendants' machine has the swivel joint attached to the frame, the vibratable link in the same form as the plaintiff's, and the draft-rod attached forward in substantially the same way as the plaintiff's; but instead of having a swivel joint at M', as stated in plaintiff's machine, forward of the shoe, the draft-rod has a swivel joint at the rear end of the shoe; and there is an arm attached to a part of the vibratable link substantially like that of the plaintiff's; and the substantial difference, as it seems, between the plaintiff's device, as described in the first and second claims, and that of defendants', is that the draft-rod is attached to the rear part of the shoe, and not to the forward part, as in the plaintiff's patent. There are also other devices in the defendants' machine which may make it different from the plaintiff's. But as to the swivel joint, the vibratable link, and the mode in which the motion is produced in the finger-bar, there does not seem to be much difference in substance; and in both machines, and by substantially the same means, there is produced a rocking motion. In this connection it is noticeable that the defendants, in the claims set forth in their specifications, make a rocking motion of the shoe and cutter a feature of their combination.

In their second claim they say that they claim the combination of the "shoe, and the drag-bar extending over and in the rear of the shoe, and its swivel pin connecting it with the rear end of the shoe, whereby the drag-bar sustains the thrust of the shoe while leaving it free to rock on its hinges." Again, in their fifth claim, they say that they claim the combination "of the shoe, the forked coupling-arm, the drag-bar extending over and in the rear of the shoe, the swivel pin connecting the two, the rocking lever and detent mounted on the drag-bar, and the adjustable link connection between the lever and the coupling-arm, whereby the shoe readily may be rocked or adjusted;" and again, the motion which seems to be produced in the operation of plaintiff's machine is more distinctly described in the seventh claim made by the defendants in their patent, as follows: The combination "of the shoe, the drag-bar, the forked coupling-arm," and the other elements of mechanism before mentioned, "whereby the shoe is first rocked, and then lifted by one continuous movement of the lever." It must be confessed that the difference between the Zug machine and the first two claims of plaintiff's patent is not very marked. But, in view of the description contained in the specification of Zug's patent and in those of the plaintiff's patent, we are inclined to think that the plaintiff's patent may be sustained on the ground that there is a difference in the manner in which the draft-rod is attached to the shoe, and the finger-bar to the shoe and to the vibratable link; and that there is also a difference in the manner in which the combination of the various parts are adjusted; and that there is an effect produced in the plaintiff's machine which does not exist in the Zug machine. In the plaintiff's machine there is a rocking motion, and not a mere vibratory motion, such as exists in the Zug machine in consequence of the open clevis; neither is there in the plaintiff's machine the yielding of the draft-rod, as described in the Zug patent; and it is obvious, too, from the manner in which the parts are constructed in the Zug machine, that there is only a small vibratory action of the finger-bar; so that, on the whole, we think that the combination, as described in the plaintiff's patent, may be sustained.

Then, from what we have said, we do not see that there can be any substantial difference between the combination, as described, in the plaintiff's machine, of the swivel joints, draft-rod, and vibratable link, with the frame and shoe and finger-bar, and that of the defendants' machine. The differences which have been stated between the two machines in this respect do not constitute any difference in prin-

ciple. The one is substantially the same thing as the other. The additions which have been made to the defendants' machine, such as the device by which the pressure of the cutting apparatus upon the ground is regulated, and other devices which have been made, do not affect the combination as claimed in the plaintiff's machine. The attachment of the draft-rod to the rear part of the shoe, instead of to the front part, which is substantially the only difference that there seems to be in the mode of construction, cannot constitute a difference in principle, and cannot prevent the defendants' machine from being an infringement of the plaintiff's patent.

It may be said that there are differences also between the defendants' machine and that of the plaintiff in the manner in which the arm is attached to the vibratable link, and also as to the mode in which the force applied to the arm may operate upon the finger-bar; but these are differences of form and not of substance.

NOTE. After this opinion was delivered, but before any decree was entered, a petition for a rehearing was filed by defendants, and on this petition the whole case was reargued before Judges DRUMMOND and DYER, sitting together; but in giving their second decision the court did not file any new opinion, but, overruling the petition, simply reiterated the views first taken, and expressed in the foregoing opinion.