SWAIN v. HOLYOKE MACH. CO.

(Circuit Court, D. Massachusetts.   June 1, 1900.)

No. 658.

1. PATENTS—PRIOR PUBLIC USE—EXPERIMENTAL USE.

The construction for, and absolute sale to, a customer of a turbine wheel, and its installation in the manufactory of the purchaser for actual use in driving the machinery therein, more than two years prior to an application for a patent for such wheel, constitutes a prior public use which will defeat the patent, although one of the objects of the inventor may have been to have a practical test made of the machine for experimental purposes.

2. SAME—TURBINE WATER WHEELS.

The Swain patent, No. 535,467, for turbine water wheels, as to claims 1 and 3, is void on account of prior public use, and claim 2 is void because the distinctive feature therein shown lacks invention.

In Equity.   Suit for infringement of a patent.   On final hearing.

Charles F. Perkins and Chas. H. Drew, for complainant.
Elmer P. Howe and Benj. Phillips, for defendant.

LOWELL, District Judge.   This is a bill in equity for an injunction to restrain the defendant from infringing the first, second, and third claims of letters patent No. 535,467, for improvements in turbine water wheels.   The claims are as follows:

"(1) Two vertical turbine water wheels in one machine, discharging their effluent water towards each other, combined with a common receptacle into which the water from both wheels is discharged, said receptacle being so constructed on the inside as to form a partition or obstruction therein, located between the wheels, whereby the direction of the stream from each wheel is diverted, and its action against the stream of the other wheel is wholly or partially obviated, substantially as described.

"(2) Two turbine wheels, provided with a surrounding flume case and induct passages, each wheel discharging its effluent water into a quarter turn, A, having its top surface curved outwardly and downwardly from said wheel, said quarter turns being located between the wheels, in combination with said quarter turns, A, A, and a draft pipe, O, having a vertical partition, i, throughout its entire length, which is practically a continuation of the central walls between the quarter turns, whereby the entire educt is divided into two separate passages, substantially as described.

"(3) The combination of two turbine wheels provided with a surrounding flume case and induct passages, and arranged to discharge the water into a common educt passage located between them, and provided with a dividing partition which curves outwardly and downwardly from each wheel, substantially as described."

Several defenses have been set up, but it is necessary to consider only one of them.

More than two years before the patent in suit was applied for, the following transaction took place:   One Chaffee, the agent of a corporation having its manufactory at Moodus, Conn., having heard that the patentee had set up at Ticonderoga, N. Y., certain turbine wheels, which need not further be described, wrote to him—

"Stating the desire of said corporation of substituting a pair of wheels for the wheel then in use at Moodus, and visited the plaintiff by appointment, at

his home at Chelmsford, Mass., for the purpose of consulting him about the matter. That the plaintiff then went to the mills of said corporation at Moodus, and after ascertaining the conditions under which it was required that the wheels should be operated, and the location in which they were to be placed, and the work which was required to be done, agreed with said Chaffee to put in place of the wheel then in use a pair of wheels to be connected with the supply and draft tubes which had been employed with the old wheel. In compliance with this agreement, a pair of turbine water wheels and their equipments were delivered in the latter part of December, 1878, at the mills of said corporation at said Moodus, and the wheel then in use was removed, and said wheels then delivered were duly installed and set up in the location theretofore occupied by said former wheel, the supply and draft tubes as originally built and located being utilized. These two wheels were mounted on a horizontal axis, arranged in a casing so as to discharge towards each other; a depression in the casing, and a partition extending downward therefrom, being provided to prevent the action of the stream from one wheel upon the stream discharged from the other. That the plaintiff, Asa M. Swain, superintended and assisted in the installation of said wheels. That the water was turned onto said wheels, and they were set in motion, without connection with the mill which they were designed to operate, on the 3d day of January, 1879, and on Saturday, the 4th day of January, 1879, the regulator and main belt were connected with said wheels, and said wheels were operated to run the shafting and a part of the machinery in said mill. That on said 4th day of January, 1879, the said Swain left Moodus, and on the following Monday, to wit, on the 6th day of January, 1879, the machinery in said mill was connected with said shafting and operated by said wheels. That the wheels and other new parts were built by Silver & Gay, of North Chelmsford, Mass, under the direction of said Swain. On January 9, 1879, said Chaffee made a draft (for $654.42) on said Demarest & Joralemon, payable to the order of said Silver & Gay, and mailed the same to the latter. On the 10th day of January, 1879, said Silver & Gay received said draft, at North Chelmsford. Silver & Gay sent said draft to New York for collection through the Railroad National Bank, Lowell, and the National Hide & Leather Bank, Boston, and it was paid at the Hanover Bank, New York, on January 13, 1879, by the check of said Demarest & Joralemon. That for the labor personally performed by said Swain at Moodus, in superintending and assisting in the installation of said wheels, payment was made by said corporation directly to said Swain from time to time as the work progressed, before said Swain left Moodus, as heretofore stated."

The application for the patent in suit was dated January 10, 1881. The machine thus set up embodied the first and third claims above mentioned. The complainant seeks to overcome the force of this evidence of public use by showing that the establishment of the machine at Moodus was solely for the purpose of experiment. He testified substantially as follows:

"I had conversation with Mr. Chaffee at North Chelmsford, before going to Moodus, and also while I was there. Mr. Chaffee explained to me how he was situated, the kind of wheel he had in use, the difficulties he had with it, and I think gave me the size of his feed pipe or feeder, also his draft pipe, the head under which the wheel was working, and the height of the tail water. He also stated if it were possible he desired to retain the old feeder and draft pipe. He also stated that what had induced him to apply to me to help him out of his difficulty was chiefly the reputation and successful installation of a double vertical wheel at Ticonderoga, N. Y.; that his superintendent, Mr. Pollock, had visited that mill, and was very much pleased with the operation of those wheels. I told him that that style of wheel, with the outward discharge, would not be applicable to his place if he insisted upon making connection with his old feed pipe and old draft pipe. I told him that I had a plan, and sketched it on paper with a pencil, and which I had no doubt would

answer every purpose, provided he would provide the suitable feed pipe and draft pipe. The old feed pipe, being only twenty inches in diameter, I insisted was much too small to supply the pair of wheels which was proposed. The old draft tube was also too small, and I thought it very doubtful if one wheel could be run to advantage with the water shut off from the other wheel, and with a sharp angular contraction from twenty inches, the size of the proposed new draft tube, to sixteen inches in diameter, the size of the old one. He wanted to know if I couldn't make my new work so that the proper feed pipes and draft tubes could be supplied at some future time without disturbing the setting of the wheels. I told him they could be so arranged. He wanted to know what the probabilities were of being able to run his mill, as then constituted, using the old pipes, and saying that he intended to fill it to its fullest capacity as soon as the business would warrant, and that he would then put in a draft tube and feeder, as recommended. He said he didn't know for himself, but had sufficient confidence in my judgment and experience to leave it to me to do as I thought best, except to use his old feeder and draft tube, and until such time as he could fill his mill with additional machinery. I told him this was an experiment, and that I had been looking for a chance to try it; that I had no property of my own, having lost it all the year before, and I didn't want to make a failure of it. I told him I knew the machine could not be properly tested without a change in those pipes. He then assured me that that was fully his intention, and that the change should be made to conform to my recommendations. Upon this assurance, and believing, after looking over his mill, that with all the disadvantages in small pipes he would have no trouble in running his mill, I consented to his proposition. Business continuing dull, and, after a time, having been troubled with the breaking of the guides and floats, after replacing them a number of times, he, after about four years' use, took out all the inside works, and replaced them with a machine made by the Humphrey Machine Company."

He further testified that he discussed thoroughly with Mr. Chaffee the losses and disturbances caused by the size of the feeder and of the old draft tube at Moodus; that he knew these objections before the installation of the Moodus wheel; that he doubted if the machine would work with the old pipe; that he had some conversation with Mr. Chaffee before leaving Moodus, in which the latter promised to report to him the result of the experiment so far as could be known under the existing conditions; that he received a letter from Mr. Chaffee, since lost, some five or six weeks after leaving; what were the contents of this letter he did not state; that the proposed test upon which he relied at Moodus was "driving the mill in a successful manner, when it was filled in with machinery, or when the supply of water became so small that it could be used upon one wheel to better advantage than when distributed upon both"; that such a test would not be sufficient to determine the precise advantage of his invention; that such a test "is what is called a 'practical test' by many millwrights and manufacturers, and by them considered sufficient for all practical purposes, and was entirely sufficient in the case of one manufacturer, together with the general reputation of the Swain wheel for first-class results, to induce manufacturers to adopt them in a large number of cases, the largest manufacturing concern in Rhode Island having purchased twelve pairs. While this adoption is very satisfactory as far as it goes, a complete test in every respect and of the most scientific character is the only test that entirely satisfies me." Complainant further testified that from Mr. Chaffee's representations he hoped that the changes in the feeder and draft tube would be made in

a year; that he estimated the loss by back pressure at five or six feet; that he made improvements in his machine after the installation at Moodus; that he did not think the wheels would do the work with the old feeder and draft tube; that the calculations and drawings for the Moodus wheel took nearly all his time for four months; that an assistant was employed to make the quarter turns; that the pattern drawings were not included in the manufacturer's bills, which included the ironwork alone; that the entire amount paid by Chaffee for the machine, including that paid to Swain for labor and services, was less than the cost of the ironwork. On this point there was contradictory evidence given by a witness for the defendant, and the undisputed facts, as first above stated, should be referred to.

Mr. Chaffee testified that at the time he first saw Mr. Swain he was intending to increase the capacity of his mill, and that he stated this to Mr. Swain; that he contemplated building an addition, and that Mr. Swain planned the wheel with reference to doing the work that Mr. Chaffee expected to do; that he (Chaffee) hoped to make the change in 1879, but that in fact it was not made till 1880; that it was Mr. Swain's wish to have a larger draft pipe; that the reason why the larger pipe was not employed at first was that the 16-inch pipe was already in place, and Mr. Swain thought it would do the work all right,—would run the mill as it was then previous to the proposed addition; that he reported to Mr. Swain as to how the wheels were operating about January 25, 1879; that Mr. Swain was three or four times at the mill to make repairs or changes upon the wheels after they were installed; that Mr. Swain wanted a 20-inch draft pipe and a 24-inch supply pipe, and very strongly objected to connecting to the old pipes, for the reason that his wheel would not do its best work as so connected; that he consented to use the old pipes in that way, because Mr. Chaffee told him that an addition was soon to be built, and the wheels were to be used nearly to their full capacity; that Mr. Swain thought it would not give the wheels a fair chance to do their best work on the old pipes; Mr. Swain had what he thought was a very nice machine, and wanted to put it in to the best advantage possible; that he (Swain) consented to connect onto the old supply and draft pipes; that it was done in that way.

"Int. 51. State whether or not his objections were withdrawn after or in consequence of any statements or assurances made by you, and, if so, what they were. Ans. I told him that we were intending very soon to build onto the mill, and I had before told him that the wheel must be sufficient to do the work after the mill was built onto. Int. 52. Did you tell him whether or not you would substitute or adopt the size of pipes advised by him? Ans. Oh, yes; I expected to put in the pipes that he advised, as soon as it became necessary. Int. 53. Whether or not the substance of that was stated to Mr. Swain by you. Ans. Of course, I can't tell exactly what we said twenty years ago. I have no doubt that I did, although I can't state it exactly, although I know that we had it in our minds all the time. Int. 54. Did Mr. Swain state whether or not larger pipes would be required when the contemplated addition was made to your mill? Ans. I am not sure that he did, although I think so. Int. 55. State whether or not you told him that the larger pipes, as advised by him, would be put in as required, when the contemplated addition was made to the mill. Ans. Yes."

102 F.—58

It must be borne in mind that Swain is the complainant seeking to meet a fatal objection to this bill by giving testimony of events about 20 years old, and that Chaffee, though apparently disinterested, is manifestly a friendly witness called by the complainant to corroborate testimony already given.

From all this evidence I conclude that Mr. Swain sold to Mr. Chaffee a machine embodying the first and third claims of the patent in suit; that the sale was without restriction, though Mr. Swain doubtless asked for larger pipes, and Mr. Chaffee informed him that when the proposed addition to the mill was made such pipes would be put in; that Mr. Swain's reasons for making the sale were—First, a desire to introduce his invention and make it known to the public; second, a desire to see how his invention would work, with a view to improving the same. I doubt if Mr. Chaffee thought or cared anything about the experimental features of the plan. That which Swain represents as promises made to him by Chaffee I believe to have been statements of intention made by Chaffee in answer to Swain's expression of opinion, and his advice concerning the shape and size of draft and supply pipes. In fact, no experiment was ever made or attempted, and Swain made no attempt to induce Chaffee to alter the pipes so as to make an experiment possible. Finding his experiment interfered with by the smallness of the pipes, as he says, Mr. Swain ceased to have any interest in the Moodus installation, and left the property, without more, to Mr. Chaffee. The latter was entirely at liberty to sell the machine separately or in situ to any purchaser he could find.

Rev. St. § 4886, authorizes the patenting of a machine "not in public use or on sale for more than two years prior to his [the patentee's] application." A certain kind of experimental use is held to be without the language just quoted, but it seems to me that the sale to Chaffee and the use at Moodus were within the statutory exception. Fruit-Jar Co. v. Wright, 94 U. S. 92, 24 L. Ed. 68; Egbert v. Lippmann, 104 U. S. 333, 26 L. Ed. 755; Hall v. MacNeale, 107 U. S. 90, 2 Sup. Ct. 73, 27 L. Ed. 367; Manning v. Glue Co., 108 U. S. 462, 2 Sup. Ct. 860, 27 L. Ed. 793; Manufacturing Co. v. Sprague, 123 U. S. 249, 256, 8 Sup. Ct. 126, 31 L. Ed. 143.

In the last case it was said:

"A use by the inventor for the purpose of testing the machine, in order by experiment to devise additional means for perfecting the success of its operation, is admissible; and where, as incident to such use, the product of its operation is disposed of by sale, such profit from its use does not change its character; but where the use is mainly for the purposes of trade and profit, and the experiment is merely incidental to that, the principal, and not the incident, must give character to the use. The thing implied as excepted out of the prohibition of the statute is a use which may be properly characterized as substantially for purposes of experiment. Where the substantial use is not for that purpose, but is otherwise public, and for more than two years prior to the application, it comes within the prohibition. The language of section 4886 of the Revised Statutes is that 'any person who has invented or discovered any new and useful * * * machine, * * * not in public use or on sale for more than two years prior to his application, * * * may * * * obtain a patent therefor.' A single sale to another of such a machine as that shown to have been in use by the complainant more than two years prior to the date of his application would certainly have defeated his right to a patent,

and yet, during that period in which its use by another would have defeated his right, he himself used it for the same purpose for which it would have been used by a purchaser. Why should the similar use by himself not be counted as strongly against his rights as the use by another to whom he had sold it, unless his use was substantially with the motive and for the purpose, by further experiment, of completing the successful operation of his invention?"

See, also, Henry v. Soap-Stone Co. (C. C.) 2 Fed. 78; Delemater v. Heath, 7 C. C. A. 279, 58 Fed. 414.

The cases cited by the complainant are for the most part easily distinguishable. In Elizabeth v. Pavement Co., 97 U. S. 126, 24 L. Ed. 1000, there was no sale of the patented article, and the use made of it was after the filing of a caveat:

"Had the city of Boston or other parties used the invention, by laying down the pavement in other streets and places, with Nicholson's consent and allowance, then, indeed, the invention itself would have been in public use, within the meaning of the law. But this was not the case. Nicholson did not sell it, nor allow others to use it or sell it. He did not let it go beyond his control. He did nothing that indicated any intent to do so. He kept it under his own eyes, and never for a moment abandoned the intent to obtain a patent for it."

In Beedle v. Bennett, 122 U. S. 71, 7 Sup. Ct. 1090, 30 L. Ed. 1074, there was no sale of the patented article, and no use made of it except by himself, and for the benefit of the soldiers of the regiment of which he was in command. The court said (page 77, 122 U. S., page 1093, 7 Sup. Ct., and page 1076, 30 L. Ed.):

"There is no evidence in the record of any use or sale of the invention by Green before his application for a patent, and no evidence from which to conclude that any use of any driven well by others before his application was consented to or allowed by him, except in the instances mentioned at Cortland, which were merely experimental tests, made by himself. Much less is there any evidence to show that there was any use of the invention by others for more than two years prior to his application."

In Pitts v. Hall, 2 Blatchf. 229, Fed. Cas. No. 11,192, and McCormick v. Seymour, 2 Blatchf. 240, Fed. Cas. No. 8,726, the question was of the use of an invention within two years of the date of the application. In Harmon v. Struthers (C. C.) 57 Fed. 637, there was no sale of the patented article, and no money paid for its use. In Graham v. McCormick (C. C.) 11 Fed. 859, the strongest case which the complainant has been able to find, the sale was on trial and warranted by the patentee. In Innis v. Boiler Works (C. C.) 22 Fed. 780, the sale was not absolute, but with the right of return. In Eastern Paper-Bag Co. v. Standard Paper-Bag Co. (C. C.) 30 Fed. 63, it was held that a process patent was not avoided by the sale of imperfect machines which would not work the process.

In Sinclair v. Backus, 5 Ban. & A. 81, 84, 4 Fed. 542, Judge Lowell said:

"Another question, which always arises, is whether the use was within the limits of a justifiable test or experiment. I have read the evidence with great care, and am satisfied that Moore did not make a wrench for sale until within two years before his application. As the value of his invention was not for his personal use, as is often the fact with manufacturers who improve a machine used in their particular business, so much as for the sale of the

tools or the royalties, I consider this fact very important. * * * The point which the defendant takes as to the use by Edminster is that Moore permitted him to try the wrench in order to induce him or his father to take an interest in it and help Moore in procuring a patent. The witness so puts it; but I consider it too nice a point to say that the future patentee, when he permits a person to test his tool by a short use, with a view to interest him in its being patented, is not testing his tool, but only the mind of the borrower. I do not know that an inventor is bound to satisfy his own mind alone by his experiments. The question to be determined is not only whether the tool will work, but in what modes and with what advantages over old tools; how well it will work and how cheaply; and I am of opinion that he may, in such a case as this, test not only its patentability, but the degree of it, if I may so say,—that is, whether it is worth while to patent it. I must not be understood as speaking of a case in which the tool or thing patented has been sold more than two years before the application."

Experimental use is of two sorts: (1) In order to enable the inventor to test the practicability or utility of his invention, and to prove and perfect the same. Experiments of this sort cannot, in the nature of things, always be made by an inventor alone, but must sometimes be carried out by placing the invented article in the hands of others. A use solely for experiment of this sort to satisfy the inventor, and, perhaps, as Judge Lowell suggests, to satisfy some one from whom the inventor hopes to receive aid in patenting the invention, is not deemed a public use, within the meaning of the statute. (2) In order to satisfy the public that the article invented is adapted to meet a public need. To secure public favor for the invention, the inventor commonly desires to secure, even at some pecuniary sacrifice, a considerable amount of this sort of experimental use, but, in my opinion, an experiment of this sort, when carried out by means of an unrestricted sale to and unrestricted use by a stranger, is not the less a public use, within the meaning of the statute.

The installation at Moodus, therefore, disposes of the first and third claims in suit. The second claim differs from the third only in the prolongation of the partition through the entire length of the educt. In this prolongation there appears to me to be no invention. Bill dismissed, with costs.